## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIMOTHY CHAMBERLAIN,     )
                                        )

       **Plaintiff,**          )
                                          )

     **v.**                     )     2:07cv241
                                          )     **Electronic Filing**

MICHAEL J. ASTRUE,        )
COMMISSIONER OF SOCIAL    )
SECURITY,                  )
                                          )

       **Defendant.**         )

## MEMORANDUM OPINION

March 4, 2008

## I.    INTRODUCTION

Plaintiff, Timothy Chamberlain ("Plaintiff"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act"). The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level.

## II.    PROCEDURAL HISTORY

Plaintiff protectively applied for DIB and SSI benefits on July 31, 2004, alleging disability as of September 13, 2002. R. 257. The applications were denied by the state agency on October 1, 2004. R. 26. Plaintiff responded by filing a timely request for an administrative hearing. R. 34. On October 18, 2005, a hearing was held in Greensburg, Pennsylvania, before Administrative Law Judge Raymond J. Zadzilko (the "ALJ"). R. 268. Plaintiff, who was represented by counsel, appeared and testified at the hearing. R. 272-298. Timothy Mahler ("Mahler"), an impartial vocational expert, was present for the entire hearing and testified before its conclusion. R. 292-296. In a decision dated August 16, 2006, the ALJ issued a decision in which he determined that Plaintiff was not "disabled" within the meaning of the Act. R. 11-19. The Appeals Council subsequently denied Plaintiff's request for review, thereby making the

ALJ's decision the final decision of the Commissioner in this case. R. 5-7. Plaintiff now seeks review of that decision, and the matter is pending before this Court on cross-motions for summary judgment.

## III.   STATEMENT OF THE CASE

Plaintiff was born on November 7, 1964, making him thirty-seven years old at the time of his alleged onset of disability and forty-one years old at the time of the ALJ's decision. This made him a younger individual for purposes of 20 C.F.R. §§ 404.1563(c) and 416.963(c). He has the rough equivalent of a high school education.[1] The record indicates that Plaintiff worked during the fifteen years prior to his alleged onset date. In the early 1990s, Plaintiff worked as a security guard. R. 278. Between 1998 and 2000, he worked as a burial vault installer. R. 67, 276-277. Thereafter, between 2000 and 2002, he worked as a cook and delivery driver for a pizza establishment. R. 67, 277-278.

Plaintiff was involved in a car accident on September 13, 2002. R. 279. He testified that his car, which was struck from the rear, was totaled. R. 279. Plaintiff's vehicle had apparently come to a stop when it was hit from behind by a vehicle that was traveling at a rate of sixty miles per hour. R. 150. At the time of impact, Plaintiff was in the front passenger seat of the vehicle, and his seatbelt was fastened. R. 150. Immediately after the accident, Plaintiff was seen in the emergency room at Jeannette District Memorial Hospital ("Jeannette"). R. 130-137. The attending physician, Dr. Curtis Peterson, reported that no acute fracture could be found. R. 136. Although his examination revealed "minimal anterolisthesis of C2 in relation to C3," Plaintiff's disc spaces, neural foramina, pedicles and odontoid process were all found to be intact. R. 136. Dr. Peterson opined that Plaintiff's anterolisthesis may have been positional or secondary to muscle spasm. R. 137.

On June 24, 2003, Plaintiff returned to Jeannette after a heavy battery fell on his left foot. R. 140. Plaintiff was examined by Dr. Gerald T. Celestine. R. 146. Dr. Celestine noted that an

---

[1]At the hearing, Plaintiff responded in the affirmative when asked by the ALJ whether he had a GED. R. 18.

examination revealed "soft tissue swelling." R. 146. Nevertheless, an x-ray revealed that Plaintiff had suffered neither an acute fracture nor a dislocation. R. 146.

As a result of the car accident, Plaintiff began to suffer from chronic pain in his lower back. He sought treatment from Dr. Kevin Wong, his primary care physician, and Dr. Mark Abbott, a chiropractor. R. 138-139, 153-245. On October 17, 2002, Dr. Abbott reported that Plaintiff was able to resume his normal work activities without restrictions. R. 217. Nonetheless, on July 30, 2003, Dr. Wong noted that Plaintiff was "miserable" and "achy." R. 153. Plaintiff told Dr. Wong that he could no longer sit up straight in a car, and that his back felt so weak that he thought that it might "give out." R. 153. At that time, Plaintiff was taking 2000 mg of Neurontin on a daily basis. R. 153.

Plaintiff returned to see Dr. Wong on January 6, 2004. R. 153. By then, he was taking 4000 mg of Neurontin. R. 153. According to Dr. Wong, this dosage level allowed Plaintiff to remain functional without becoming drowsy. R. 153. Plaintiff indicated to Dr. Wong that when he took a lesser amount of Neurontin, his aches would deteriorate to the point at which he could no longer function. R. 153.

At the hearing, Plaintiff testified that he sustained bladder damage during the car accident. R. 279. He explained his symptoms as follows:

A.    I have bladder damage.

Q.    Okay. What kind of bladder damage?

A.    No sensation in it.

Q.    What does that mean?

A.    I can't tell whether it is full or whether it is empty.

Q.    Okay. What does that do to your bathroom use?

A.    Well, to go to the bathroom I have got to go and sit for an hour, and sitting for that period of time my legs go numb.

Q.    Okay. And how frequently do you do that?

A.    Normally twice a day.

Q.    Twice a day. Okay. What does your doctor recommend?

3

| A. | He wants me to go every three or four hours. |
|----|----|
| Q. | What doctor is that? |
| A. | Dr. Zitan (Phonetic). |
| Q. | Zitan. Okay. And how can you tell when you have to go to the bathroom? |
| A. | Well, either my kidneys start hurting, but then I can't tell whether it is my kidneys hurting, or whether it is just my back hurting. But most of the time I get bloated and it interferes with my breathing. |
| Q. | I see. And then you have to go spend an hour in the bathroom? |
| A. | Yes. |
| Q. | Okay. So how about your impotence? Are you impotent from this automobile accident? |
| A. | Yes. |

R. 278-279. Plaintiff's testimony concerning his urinary problems is supported by the medical evidence contained in the record. When Plaintiff visited Dr. Wong on January 6, 2004, Dr. Wong noted that Plaintiff was experiencing both impotence and a lack of urgency to void. R. 153. Plaintiff apparently had large amounts of urine in his bladder, causing him to suffer more back pain. R. 153. Dr. Wong was left with the impression that the accident had caused Plaintiff to suffer severe chronic back pain, and that his back injury had resulted in a dysfunction of his autonomics. R. 153. Plaintiff was referred to Dr. Munir Zaitoon for a urological evaluation. R. 153, 147.

Dr. Zaitoon examined Plaintiff on February 10, 2004. R. 147. Plaintiff told Dr. Zaitoon that he had "no sensation or desire to void unless he ha[d] flank pain." R. 147. Plaintiff was voiding approximately two to three times per day, and he was "able to empty his bladder adequately." R. 147. Plaintiff reported that he had been experiencing impotence in the aftermath of the car accident, but he indicated that he was able to have "a good morning erection." R. 147. Although Plaintiff had some urgency to void while Dr. Zaitoon was performing a rectal examination, he was unable to give a urine sample during his office visit. R. 147. Since Plaintiff had no "rectal sphincter dysfunction," Dr. Zaitoon opined that it was "doubtful" that Plaintiff's urinary problems were "organic in nature." R. 147. Dr. Zaitoon suggested that Plaintiff "could

4

benefit from timed voiding every 3-4 hours." R. 147. Plaintiff was given samples of Viagra. R. 147.

Plaintiff returned to Dr. Wong's office on June 4, 2004. R. 153. At that time, Plaintiff continued to suffer "significant back pain" which sometimes traveled to his right leg and hip. R. 153. Although he was taking 800 mg of Neurontin five times per day, he still could not get comfortable. R. 153. Plaintiff informed Dr. Wong that he had to change positions frequently because of his discomfort. R. 153. Dr. Wong noted that Plaintiff had been changing positions during the office visit. R. 153.

Dr. Wong referred Plaintiff to Dr. Ramalingam Ravishankar for a psychiatric consultation. R. 153. Dr. Ravishankar examined Plaintiff for the first time on July 22, 2004. R. 150-152. Dr. Ravishankar was left with the impression that Plaintiff had suffered a lumbar strain (or sprain) at the time of the accident, and that myofascial pain syndrome had subsequently developed. R. 152. EMG and nerve conduction studies were ordered to rule out radiculopathy, and an interferential stimulator was ordered for Plaintiff's back. R. 152.

Plaintiff returned to see Dr. Ravishankar on August 19, 2004, for a follow-up appointment. R. 148-149. On that occasion, Plaintiff's back exhibited "no significant tenderness." R. 148. Plaintiff walked with a "normal gait," and he was able to stand with his feet together and his eyes closed without having any balancing problems. R. 148. Dr. Ravishankar gave Plaintiff samples of Celebrex and instructed him to take 200 mg of it per day. R. 149.

On September 29, 2004, Plaintiff returned to Dr. Ravishankar's office and informed him that the Celebrex had not been helpful. R. 176. Dr. Ravishankar suggested that Plaintiff might benefit from aquatic therapy. R. 176. That same day, a medical consultant completed a physical residual functional capacity assessment form in connection with Plaintiff's applications for DIB and SSI benefits under the Act. R. 104-109. Plaintiff was found to have had no manipulative, visual, communicative or environmental limitations. R. 106-107. Nevertheless, the consultant concluded that Plaintiff had several exertional limitations. Specifically, it was determined that while plaintiff could frequently lift or carry twenty-five pounds, he could lift or carry fifty pounds

on only an occasional basis.  R. 105.  Although Plaintiff's pushing and pulling abilities were deemed to be unlimited, the consultant opined that he could sit, stand or walk for only six hours in an eight hour workday.  R. 105.  Plaintiff's statements about his impairments and resulting limitations were found to be only partially credible.  R. 109.

Plaintiff saw Dr. Ravishankar again on February 9, 2005.  R. 174-175.  Dr. Ravishankar noted that Plaintiff had been gaining weight, and that his back pain had started to increase.  R. 174.  Plaintiff was informed of his need to begin both physical therapy and a home exercise program.  R. 174.  One day later, Plaintiff underwent EMG and nerve conduction studies on his bilateral lower extremities.  R. 172-173.  The studies revealed "no electrodiagnostic evidence of a radiculopathy."  R. 173.

On September 22, 2005, Dr. Abbott determined that Plaintiff had experienced a "10% partial permanent disability of the lumbar spine."  R. 193.  According to Dr. Abbott, Plaintiff could sit, stand, walk or drive for only two hours in an eight-hour workday."  R. 194.  Dr. Abbott indicated that while Plaintiff could occasionally lift up to ten pounds, he could never lift more than ten pounds.  R. 194.  In Dr. Abbott's view, Plaintiff was totally unable to crawl or climb, and was limited to only occasional bending, squatting, and reaching above the shoulder level.  R. 194.

By October 2005, Dr. Wong was of the view that Plaintiff's condition had worsened to the point at which he could not perform the duties of a full-time job.  R. 184.  On October 15, 2005, Dr. Wong opined that Plaintiff could only sit or drive for two hours, and stand or walk for one hour, during the course of an eight-hour workday.  R. 185.  He indicated that Plaintiff could lift between ten and twenty pounds only occasionally, and that he could never lift more than twenty pounds.  R. 185.  Although Dr. Wong believed that Plaintiff could frequently reach above his shoulder level, he believed that Plaintiff could never crawl or climb, and that Plaintiff was limited to only occasional bending or squatting.  R. 185.

Dr. S.P. Barua performed a consultative orthopedic examination of Plaintiff in December 2005.  He diagnosed Plaintiff as suffering from both deconditioned muscles and a chronic lumbosacral strain.  R. 248.  On December 8, 2005, Dr. Barua reported that Plaintiff's ability to

stand or walk was not affected by his back injuries, but that Plaintiff was nevertheless limited to four hours of sitting during the course of an eight-hour workday. R. 251. In his view, Plaintiff could frequently lift up to fifteen pounds and occasionally lift up to thirty pounds. R. 250. Dr. Barua also opined that Plaintiff was limited to only occasional climbing, kneeling, crouching, stooping, balancing or crawling, and that he should avoid heights, humidity and temperature extremes. R. 252.

Subsequent to the hearing, the ALJ submitted written interrogatories to Mahler. Mahler answered these interrogatories in writing on June 27, 2006. R. 127. The interrogatories included inquiries concerning three different residual functional capacity assessments. The first such inquiry was as follows:

> Please assume there is a person of the same age, education, training, and work experience as the claimant. This person is limited to occasionally lifting and carrying 30 pounds, frequently lifting and carrying 15 pounds. Such person has no limitation on standing and walking, but is limited to sitting for four hours per eight-hour workday. Please assume that the hypothetical person is limited to occasional postural maneuvering such as stooping, kneeling, crouching, crawling, balancing, bending, and climbing and he must totally avoid unprotected heights. This person must avoid concentrated exposure to excessive humidity and temperature extremes. Could such person engage in any unskilled light work activity?

R. 122. Mahler responded to this interrogatory in the affirmative, identifying the jobs of desk attendant, mail clerk, hostess/greeter, hand packer, inspector/checker and laundry folder as both consistent with this residual functional capacity assessment and existing in significant numbers in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A).[2] R. 122-123. At the sedentary level, Mahler identified the jobs of surveillance system monitor, sorter/grader, assembler, waxer

---

[2] 20 C.F.R. § 404.1567(b) provides: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." Identical language is contained in 20 C.F.R. § 416.967(b).

and cashier as satisfying the requisite criteria under the Act.[3]  R. 123.

The ALJ next asked Mahler whether jobs existed in significant numbers in the national economy for a hypothetical individual with that same residual functional capacity who also needed a sit/stand option which allowed him to sit for no more than fifteen to thirty minutes at a time, at which point he would have to stand.  R. 124.  At the light exertional level, Mahler identified the jobs of desk attendant, mail clerk, hand packer, inspector, laundry folder and gate guard.  R. 124.  At the sedentary exertional level, Mahler identified the jobs of surveillance system monitor, sorter/grader, assembler, inspector/checker, waxer and cashier.  R. 125.

The final residual functional capacity assessment referenced in the ALJ's interrogatories to Mahler was the following hypothetical question:

> Please assume there is a person of the same age, education, training, and work experience as the claimant.  This person is limited to occasionally lifting up to 20 pounds.  This person is further limited to sitting two hours, standing one hour, and walking one hour in an eight hour workday.  This person is occasionally able to bend and squat, but cannot crawl or climb.  This person is to avoid unprotected heights.  Also, this person will need frequent rest periods during the day and will frequently probably miss work due to exacerbations of pain.  Could such person engage in any unskilled light work activity or unskilled sedentary work activity, including such work with a sit/stand option?

R. 125.  Mahler answered this question in the negative, opining that no jobs satisfying the Act's criteria existed to accommodate an individual with the enumerated limitations.  R. 125.  Mahler also indicated that most employers would tolerate an employee who was absent from work approximately one day per month, and who was off-task for ten to fifteen percent of a workday, six to nine minutes per hour, or forty-eight to seventy-two minutes per day.  R. 126.

## IV.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d

---

[3]20 C.F.R. § 404.1567(a) provides: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  Identical language is contained in 20 C.F.R. § 416.967(a).

Cir. 1994). The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 108 S.Ct. 2541, 2545 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. § 423(d)(1). A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To support his ultimate findings, the ALJ must do more than simply state factual conclusions. He must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The

United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 196 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.    DISCUSSION

In his decision, the ALJ first noted that Plaintiff was only insured for benefits under Title II of the Act through September 30, 2003, and that he could not obtain benefits under Title II unless he could establish the existence of a disability on or before that date. R. 13. Moving on to

the sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. R. 15. Plaintiff was found to be suffering from a "lumbosacral strain and deconditioning resulting from residuals of a back injury following a motor vehicle accident." R. 15. This impairment was found to be "severe" for purposes of 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii) and 416.920(c). R. 15. Although it was acknowledged that Plaintiff suffered from a dysfunctional bladder, this impairment was not deemed to be "severe." R. 16. The ALJ concluded that Plaintiff did not suffer from an impairment (or combination of impairments) which met or medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing of Impairments"). R. 16. In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ made the following residual functional capacity assessment:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work activity. Further, he is limited to lifting and carrying 30 pounds occasionally and 15 pounds frequently, has no limitations standing or walking but is precluded from sitting more than four hours in an eight-hour workday. He is limited to occasional stooping, kneeling, crouching, crawling, balancing, climbing and bending and needs to avoid unprotected heights and concentrated exposure to excessive humidity and temperature extremes.

R. 16. Given this assessment, it was determined that Plaintiff could not return to his past relevant work as a cook, pizza delivery driver, vault installer or security guard. R. 18. Nevertheless, the ALJ concluded that Plaintiff could work as a game arcade desk attendant, a mail clerk, a host/greeter, a hand packer, an inspector/checker, a laundry folder, a surveillance system monitor, a sorter/grader, an assembler, a glass products waxer or a cashier. R. 19. Mahler's answers to the ALJ's interrogatories established that these jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(a). R. 19. Consequently, Plaintiff was not found to be "disabled" under 42 U.S.C. § 423(d)(1). R. 19.

In his brief, Plaintiff advances five different arguments. First, he argues that the ALJ failed to properly evaluate his subjective complaints. Doc. No. 9, p. 7. Second, he contends that the ALJ erred in concluding that his bladder dysfunction was not a "severe" impairment. *Id.* Third, he asserts that the ALJ had no "persuasive contradictory evidence" to refute the opinions

of disability expressed by his treating physicians. *Id.*, pp. 7-8. Fourth, he argues that the ALJ made an erroneous determination at the third step of the sequential evaluation process. *Id.*, p. 8. Finally, he contends that the ALJ's residual functional capacity assessment was not supported by substantial evidence. *Id.* The Court will proceed to address these arguments seriatim.

Plaintiff devotes a considerable portion of his brief to arguing that the ALJ failed to properly assess his credibility. *Id.*, pp. 8-14. He contends that the ALJ mischaracterized the record by highlighting only those portions indicating that a finding of nondisability was warranted. *Id.*, p. 11. At the outset, it is worth noting that while the ALJ was required to consider all of the evidence in the record, he was not required to reference every single treatment note in the record. *Fargnoli*, 247 F.3d at 42. Moreover, it is the province of the ALJ to resolve conflicts in the evidence, and to be the ultimate finder of fact as to issues of credibility. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985). Nevertheless, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, 61 Fed. Reg. 34483, 34486 (1996). In *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit explained that "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." The Court of Appeals went on to state that "[w]hile there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Mason*, 994 F.2d at 1067, quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984).

Although the ALJ noted that the record contained evidence of an impairment that could reasonably be expected to produce the symptoms alleged by Plaintiff, he concluded that Plaintiff's statements about "the intensity, persistence and limiting effects" of those symptoms were "not entirely credible." R. 16. After making this observation, the ALJ evaluated the documentary evidence in great detail, explaining why he did not believe Plaintiff's testimony concerning his limitations. R. 17. This Court has no mandate to substitute its own judgments as

to credibility for those of the ALJ. *Hartranft*, 181 F.3d at 360 ("We will not set the Commissioner's decision aside if it is supported by substantial evidence, even if we would have decided the factual inquiry differently."). Congress has provided that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ." 42 U.S.C. § 405(g). Consistent with this mandate, the Court cannot reject the ALJ's credibility assessments in this case.

Plaintiff's second argument concerns the ALJ's determination that his bladder dysfunction was not "severe" at the second step of the sequential evaluation process. Doc. No. 9, pp. 14-16. The second step is generally viewed as "a *de minimis* screening device to dispose of groundless claims." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 549 (3d Cir. 2003). To surmount this hurdle, a plaintiff need only demonstrate that he or she suffers from something more than a "slight abnormality" (or a combination of slight abnormalities) which would have no more than a minimal effect on his or her ability to work. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360 (3d Cir. 2004). Hence, in this context, the meaning of the word "severe" cannot be equated with the word's typical meaning.[4] The purpose of the second step of the sequential evaluation process is to dispose of claims in which a claimant fails to make a "reasonable threshold showing" that his or her impairment is "one which could conceivably keep him or her from working." *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118, 1122 (1st Cir. 1986).

In his decision, the ALJ determined that Plaintiff's bladder dysfunction was not severe for purposes of the second step of the sequential evaluation process. R. 16. In so finding, the ALJ relied on Dr. Zaitoon's opinion that Plaintiff's bladder problems were not "organic in nature." R.

---

[4]The regulations implementing the Social Security Act provide that "[a]n impairment is or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Examples of such "abilities and aptitudes" include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b).

16, 147. Dr. Zaitoon's examination of Plaintiff revealed no bladder distention. R. 147. Plaintiff argues that the ALJ's determination that his bladder dysfunction was not severe cannot be sustained by the record. In his brief, he states that "the ALJ's determination to deny [his] request for benefits at step two should be viewed with close scrutiny." Doc. No. 9, p. 15.

Two points must be made about the ALJ's conclusion that Plaintiff's bladder dysfunction was not severe under these circumstances. First of all, Plaintiff's request for benefits was not *denied* at the second step of the sequential evaluation process. Because the ALJ concluded that Plaintiff suffered from a different impairment which was deemed to be severe, this case proceeded to the third, fourth and fifth steps of the process. R. 15-18; *Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and *the sequential evaluation process should continue*.")(emphasis added). The Court acknowledges that "because step two is to be rarely utilized as a basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow" when it is employed for *that* purpose. *McCrea*, 370 F.3d at 361 (internal citations omitted). In this case, however, step two was not *utilized as a basis for the denial of benefits*. Consequently, the ALJ's determination in this case does not "raise a judicial eyebrow." *Id.* Second, the Court of Appeals has made it clear that the congressional mandate contained in § 405(g) concerning the conclusiveness of the Commissioner's findings of fact (where such findings of fact are supported by "substantial evidence") applies at *all five* steps of the sequential evaluation process. *Id.* at 360-361 ("We do not suggest, however, that a reviewing court should apply a more stringent standard of review in these cases. The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole."). Moreover, the applicable regulations require the Commissioner to consider *both* severe and non-severe impairments in assessing a claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Thus, a finding of severity as to one impairment essentially moots any adverse effects stemming from a finding of non-severity as to a distinct

impairment.[5]

In his third argument, Plaintiff contends that the ALJ improperly rejected the opinions of the his treating physicians. The law governing the Commissioner's treatment of the opinion of a treating physician is clearly established. If "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling 96-2p, 61 Fed. Reg. 34490, 34491 (1996). The ALJ must accord great weight to the reports of treating physicians, "especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). If the ALJ determines that a treating physician's opinion is outweighed by conflicting medical evidence, he or she may reject that opinion. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). Whenever the ALJ's decision is not fully favorable to the claimant, the opinion of the ALJ "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Social Security Ruling 96-2p, 61 Fed. Reg. 34490, 34492 (1996).

In his evaluation of Plaintiff's physical capacities, Dr. Wong clearly opined that Plaintiff

---

[5]It is, of course, true that the ALJ was required to consider any limitations resulting from Plaintiff's "non-severe" impairment (i.e., bladder dysfunction) in assessing his residual functional capacity. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). This issue concerns Plaintiff's fifth and final argument, which will be addressed later.

had limitations beyond those reflected in the ALJ's residual functional capacity assessment. For instance, Dr. Wong determined that Plaintiff could sit or drive for only two hours, and stand or walk for only one hour, during the course of an eight-hour workday. R. 185. He reported that Plaintiff could never climb, crawl or lift more than twenty pounds. R. 185. Dr. Abbott likewise found Plaintiff to have limitations beyond those found by the ALJ. For example, Dr. Abbott stated that Plaintiff could sit, stand, walk or drive for only two hours in an eight-hour workday, and that he could never crawl, climb or lift more than ten pounds. R. 194. The ALJ concluded that Plaintiff had no standing or walking limitations, that he could sit for four hours in an eight-hour workday, that he could frequently lift up to fifteen pounds, and that he could occasionally climb, crawl or lift up to thirty pounds. R. 16. The ALJ's assessment, however, was not made in a vacuum. It was based on the findings of Dr. Barua, who performed a consultative examination after the hearing. R. 150-153. The Court notes that, at the hearing, the ALJ inquired as to whether Plaintiff had undergone an independent medical examination in connection with a lawsuit resulting from his car accident. R. 296. Plaintiff's counsel informed the ALJ that no such examination had occurred. R. 296. The ALJ apparently wanted another opinion, which explains why Dr. Barua examined Plaintiff subsequent to the hearing. The ALJ was careful to consider all of the medical evidence, and he did not substitute his lay opinion for that of Plaintiff's treating physicians. When a conflict in the evidence exists, it is the prerogative of the ALJ to decide what evidence to credit and what evidence to reject. *Jones*, 954 F.2d at 129. Dr. Barua's consultative examination report constitutes the "substantial evidence" upon which the Commissioner's determination must be based. 42 U.S.C. § 405(g). The Court cannot substitute its own findings for those of the Commissioner, nor can it weigh the evidence in the record. Once a court determines that a finding of fact made by the Commissioner is supported by substantial evidence, no further inquiry is warranted. *Hartranft*, 181 F.3d at 360. It is of no moment that Plaintiff's treating physicians found him to be disabled. R. 184, 193. The ultimate question of disability is expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Thus, "a statement by a plaintiff's treating physician supporting an assertion that [he or] she is 'disabled' or 'unable to work' is not dispositive of the issue." *Adorno*, 40 F.3d at 47-

48. Plaintiff's third argument is without merit.

In his fourth argument, Plaintiff contends that the ALJ erred in determining that his impairments (either singularly or in combination) did not meet or medically equal a listed impairment. Doc. No. 9, pp. 20-26. The ALJ's analysis at the third step of the process concerned Listing 1.04, which states:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours:
> or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04. The ALJ concluded that Plaintiff failed to meet the requirements of this listing because there was "no evidence of herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, facet arthritis, or vertebral fracture resulting in compromise of a nerve root or spinal cord with limitation of spine motion and motor loss accompanied by sensory or reflex loss with positive straight leg raising." R. 16.

The United States Court of Appeals for the Third Circuit has made it clear that an ALJ may not rely solely on a conclusory assertion that a claimant fails to satisfy the criteria for a listed impairment, and that he or she is required to identify the particular listing (or listings) under consideration. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-120 (3d Cir. 2000). Nevertheless, the ALJ was not required "to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505. Having reviewed the ALJ's opinion, the Court is convinced that the determination regarding Listing 1.04 is supported

by substantial evidence.

The Court's analysis concerning Listing 1.04, however, does not end the inquiry. In order to assert a meritorious argument about an ALJ's error at the third step of the process, a plaintiff must, at a minimum, either identify the listing (or listings) that the ALJ should have considered or point to specific evidence ignored by the ALJ that would support a finding that the plaintiff meets or equals a listing identified in the ALJ's opinion. *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 93 (3d Cir. 2007)("We note that Appellant does not argue that the ALJ should have applied a different Listing, nor does he point to specific evidence ignored by the ALJ that would indicate that Appellant's impairments are equivalent to one of the Listings the ALJ identified."). Plaintiff satisfies this hurdle by pointing out that the ALJ failed to consider Listing 1.02, which states:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).
> With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.02. The relevant language of Listing 1.00B2 states:

> [b.](2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.
> c. *What we mean by inability to perform fine and gross movements effectively.* Inability to perform fine and gross movements effectively means an

extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above the waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2. The particular criteria for each listing is of paramount importance, since "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall *functional* impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)(emphasis added). The issue is one of *medical* equivalence. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* (emphasis in original).

Dr. Wong apparently did not believe that Plaintiff's impairments met or equaled a listed impairment. R. 184. Nevertheless, Dr. Abbott indicated that he believed Plaintiff to be *per se* disabled under Listing 1.02. R. 193. At the hearing, Plaintiff's counsel called Dr. Abbott's opinion to the ALJ's attention. R. 297. In addition, Plaintiff testified that he could not climb a flight of stairs or walk two blocks without enduring severe leg cramps. R. 281. It is unclear to the Court why the ALJ neglected to evaluate Plaintiffs impairments under Listing 1.02. In light of Dr. Abbott's finding, Plaintiff's testimony, and the specific mention of Listing 1.02 made by Plaintiff's counsel, the Court cannot overlook the ALJ's failure to evaluate Plaintiff's impairments under this listing. Moreover, the Court is not free to conduct its own evaluation of this issue to fill the gap left by the ALJ's incomplete analysis. *Fargnoli*, 247 F.3d at 44, n. 7. Hence, this case must be remanded to the Commissioner for further proceedings.[6]

---

[6]The Court notes that while the Commissioner vigorously defends the ALJ's determination with respect to Listing 1.04, he makes no argument concerning the ALJ's failure to address Listing 1.02. Doc. No. 11, pp. 18-20.

Plaintiff's final argument is that the ALJ erred in determining his residual functional capacity. Doc. No. 9, pp. 21-22. The Court has already concluded that the ALJ was not required to accept the opinions of Dr. Wong and Dr. Abbott concerning Plaintiff's functional limitations. Nonetheless, a finding of *per se* disability at the third step of the process would have rendered it unnecessary for the ALJ to assess Plaintiff's residual functional capacity. Since further administrative proceedings are required for the purpose of determining whether Plaintiff is *per se* disabled under Listing 1.02, the Commissioner will have another opportunity to assess Plaintiff's residual functional capacity (if such an assessment proves to be necessary).

Although the Court has concluded that the ALJ did not err in concluding that Plaintiff's bladder dysfunction did not constitute a severe impairment, the Court is troubled by the ALJ's failure to discuss what effects (if any) this impairment may have had on Plaintiff's ability to work when combined with his severe impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)(requiring consideration of both severe and non-severe impairments in assessing a claimant's residual functional capacity). Admittedly, Dr. Zaitoon opined that Plaintiff's urological problems were not "organic in nature." R. 147. Nevertheless, Plaintiff testified that he had to sit for an hour in order to urinate, and that Dr. Zaitoon wanted him to urinate every three to four hours. R. 280. Plaintiff's testimony is consistent with Dr. Zaitoon's written instructions. R. 147. Dr. Wong's treatment notes document Plaintiff's lack of urge to urinate until the onset of back pain. R. 153. These notes buttress Plaintiff's testimony about some of his back pain resulting from kidney problems (apparently caused by his inability to empty his bladder). R. 280. The ALJ seems to have completely discounted Plaintiff's bladder impairment after determining that it was not severe. R. 16-19. The Commissioner must remember, on remand, that the combined effects of *both* severe and non-severe impairments must be considered in assessing Plaintiff's residual functional capacity (if such an assessment is needed).

If an *impairment* causes a *limitation*, it must be reflected in the residual functional capacity assessment. *Pearson v. Barnhart*, 380 F.Supp.2d 496, 505 (E.D.Pa. 2005)("Residual functional capacity is defined as that which an individual is still able to do despite the *limitations* caused by his or her *impairments*.")(emphasis added). At the fifth step of the sequential

evaluation process, the burden is on the Commissioner to establish the existence of work in the national economy that the claimant is capable of performing. *Allen v. Barnhart*, 417 F.3d 396, 401, n. 2 (3d Cir. 2005). In order for a vocational expert's testimony to constitute "substantial evidence" that such work exists, the ALJ's hypothetical question must adequately convey *all* of the claimant's limitation-causing impairments. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). Of course, there is no requirement that an ALJ incorporate every *alleged* limitation into his or her hypothetical question. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Nevertheless, where a limitation is credibly established by the medical evidence in the record, it must be fully accounted for. Otherwise, the hypothetical question is deficient, and the vocational expert's answer to it cannot constitute "substantial evidence" of the existence of jobs compatible with the claimant's vocational and residual functional capacity assessments. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). The Commissioner should keep this in mind when evaluating Plaintiff's urological impairments.

The Court notes that Plaintiff requests a new hearing before a different ALJ. Doc. No. 9, p. 24. In the absence of a showing of bias on the part of the ALJ, it is doubtful that this Court possesses the authority to grant the requested relief. *Travis v. Sullivan*, 985 F.2d 919, 923-924 (7th Cir. 1993). Congress has provided this Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Congress has *not* given this Court the authority to oversee the conduct of Social Security administrative proceedings in a more general sense. That is the prerogative of the Commissioner. 42 U.S.C. § 405(b). The Court acknowledges that a plaintiff can obtain a remand for a hearing before a different ALJ upon a showing that he or she has been subjected to unwarranted hostility or bias by the particular ALJ in question. *Ventura v. Shalala*, 55 F.3d 900, 904-905 (3d Cir. 1995). The record in this case, however, contains no hint of bias or impropriety. Plaintiff's sole basis for requesting that he be afforded a hearing before a different ALJ is the fact that Judge Zadzilko has already made adverse credibility determinations in this case. Doc. No. 9, p. 24. Such determinations cannot form the basis for the extraordinary relief

sought by Plaintiff. The Court has thoroughly reviewed both the ALJ's opinion and the transcript of the hearing, and there is no indication that Judge Zadzilko has treated Plaintiff unfairly. Thus, the Court will neither require nor suggest that the Commissioner afford Plaintiff a hearing before a different ALJ. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). It is up to the Commissioner to decide how to administer Plaintiff's case on remand, consistent with the authority vested in him by Congress.

## VI.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner in this case must be vacated, and the case must be remanded for further proceedings consistent with this opinion. An appropriate order will follow.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:  Lee Karl
Assistant United States Attorney

David Harr, Esquire
203 S. Main Street
Greensburg, PA 15601